**William A. SPARTIN, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

**The Hay Group, National Union Fire Insurance Company, Intervenors.**

**No. 89–843.**

District of Columbia Court of Appeals.

Argued Sept. 18, 1990.
Decided Dec. 28, 1990.

---

Susan S. Magazine, Rockville, Md., for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the Memorandum in Lieu of Brief, for respondent.

Michael S. Levin, Columbia, Md., for intervenors.

Before ROGERS, Chief Judge, SCHWELB and FARRELL, Associate Judges.

ROGERS, Chief Judge:

Petitioner William A. Spartin appeals a decision of the District of Columbia Department of Employment Services (DOES or agency) denying his claim for workers' compensation benefits. In proceedings before the Hearing Examiner petitioner claimed that increased duties in his job as an international human resources consultant subjected him to an excessive amount of stress, ultimately causing him to become disabled with depression and other psychological illnesses. The Hearing Examiner concluded that petitioner's disability was not causally related to his work. The Director affirmed.

Petitioner raises three arguments before this court. He argues that (1) an inappropriate test was used to determine whether his disability was compensable, (2) the agency decision was not supported by sufficient evidence; and (3) he was not given the benefit of a statutory presumption of compensability.[1] We conclude that a remand is required since that agency did not properly apply the standard for determining whether his disability was compensable and the Hearing Examiner failed to address material issues of disputed facts.

I

Petitioner joined the Hay Group, a large human resources consulting firm, in March 1983 as President of the personnel recruiting company, MSL International Limited. Before joining the Hay Group, petitioner had executive experience in personnel recruiting, recruitment consulting, and in personnel administration. As president of MSL International Limited, petitioner was responsible for an eight-office recruiting operation. He claimed that during his tenure as president, he turned it around from an unprofitable organization to a very successful one. Petitioner testified that he worked hard at the Hay Group, but that

---

1. Petitioner also claims that "[t]he Director incorrectly applied the law to the facts in this case." That argument, however, we treat as subsumed in petitioner's first claim.

the work was fun and exciting. Although he traveled a "reasonable amount of time," he was able to spend every weekend with his family and to take off time for vacations and occasional extra days.

In 1985, Saatchi and Saatchi Consulting, Ltd., a large firm headquartered in London, bought the Hay Group. As a result, petitioner's job changed dramatically: overnight he went from president of an eight-office United States operation to Chairman of the Board of an international recruiting company and an important member of an international organization. Without being relieved of any of his former duties as president of the U.S. recruiting company, petitioner was made responsible for recruiting operations in twenty-seven offices with locations in many different countries around the world. He was immediately instructed to install a new world-wide daily cash collection accounting system, in addition to his general management and administrative responsibilities. As chairman he was also expected to engage in business development on an international scale to advance the corporate expansion strategy, a task with which he was totally unfamiliar. Petitioner testified that Saatchi and Saatchi placed unreasonable pressure on him to make his division profitable, in part to pay off debt incurred in the buy-out of the Hay Group. Saatchi and Saatchi implemented plans to stop all new hires and to cut down the existing staff; accordingly, petitioner had the difficult job of letting go employees with long service records. He was also unable to hire the help he needed to assist with his own new responsibilities.

Petitioner's travel time increased substantially after the buy-out. He continued to work out of Washington, D.C., although the company was based in London. Petitioner was thus required to travel to London twenty-seven times in one year, in addition to traveling to Saatchi and Saatchi offices all over the world. Petitioner further testified that while technically he was free to quit his job, he really had no choice but to stay because, being fifty-seven years old, he could not find employment at another company.

In June 1986, petitioner went to his physician because he was experiencing chest pain that he thought was a heart attack. His physician determined that he was not having a heart attack, but was suffering from depression-related disorders and referred him to Dr. Eden, a psychiatrist and psychoanalyst. Dr. Eden diagnosed petitioner as very depressed: two or three weeks earlier he had considered suicide; he had lost his appetite and about 38 pounds; he had become despondent and withdrawn and began avoiding people; his memory started to fail him and he was unable to concentrate; he lost interest in all things and depended entirely on his secretary running his schedule for him; and he developed a phobia for airports such that traveling would put him in a panic. Petitioner left work in June 1986, and has not worked since.

Petitioner also testified that he learned in February 1986, almost half a year before he sought medical help, that the Department of Justice was investigating allegations that one of his subordinates, who was also a close friend, had bribed a government official. By November 1986, the employee who had been charged with bribery and the official who had been accused of accepting the bribe had both implicated petitioner; both of these men were eventually incarcerated. On the advice of counsel, petitioner went to the Justice Department and, in exchange for a promise of immunity, he told prosecutors what he knew about the case. Petitioner was required to take several polygraph examinations, which he said he passed. He also claimed to have been the victim of threats against his life, which he attributed to the investigation. Ultimately, no charges were brought against petitioner.

Petitioner filed a claim for workers' compensation, and a hearing was held. At the hearing, Petitioner offered the deposition testimony of Dr. Eden, who had continued to see petitioner twice a week from July 1986 to May 1988, the date of his deposition. Dr. Eden explained that petitioner suffered from a very serious depressive neurosis. Dr. Eden stated that the demands of petitioner's job after the take-

over of Saatchi and Saatchi overloaded petitioner to a point beyond his ability to cope and were largely responsible for his disability. Dr. Eden also concluded that petitioner was unable to work as of May 1988.

Dr. Bruce Kehr, a psychiatrist who also treated petitioner from July 1986 through the time of the DOES hearing, testified that petitioner suffered from a major depressive disorder. Based on medical history told to him by petitioner, Dr. Kehr explained that petitioner suffered from depression which began sometime in early 1986 with symptoms including an inability to go to work, exhaustion, severe headaches, loss of energy, alternating loss of sleep and excessive sleep and, beginning in June 1986, severe anxiety attacks. Dr. Kehr also testified that petitioner developed symptoms associated with agoraphobia, i.e., that petitioner did not want to leave home and would have anxiety attacks upon leaving.[2] Dr. Kehr, like Dr. Eden, concluded that the buy out by Saatchi and Saatchi, with its attendant job restructuring and changes in petitioner's job responsibilities, was the cause of petitioner's disability. On cross-examination, Dr. Kehr conceded that his notes from his initial interviews and treatment sessions with petitioner do not focus on petitioner's job and the increased responsibilities, travel and financial pressure. Rather, in a letter to Dr. Eden written following his first meeting with petitioner in July 1986, Dr. Kehr described petitioner's difficulties with the Justice Department, as well as a longstanding problem with his wife's health, as "possible precipitants" to his illness; Dr. Kehr also noted that petitioner "hates his job despite being extremely successful at it." In a second letter, to the Maryland State Department of Education in early 1987, Dr. Kehr described the criminal investigation,

petitioner's wife's illness, and the management tactics of the new owners of the Hay Group as having precipitated his disability.

The intervenors offered the deposition of their own expert, Dr. Brian Schulman, a psychiatrist, who testified on the basis of one examination of petitioner on December 1, 1987, and a review of petitioner's medical records including psychiatric reports by Drs. Eden and Kehr. Dr. Schulman stated that petitioner suffered from several mental problems including difficulties with his ability to cope and handle pressure, memory loss, inability to handle complex abstract thinking problems, and a progressive irritability in his mood as well as depressive feelings and bizarre thoughts. Dr. Schulman concluded that petitioner suffered from a combination of depression and dementia, but that the dementia, which was causing petitioner confusion, decreased mental capacity, cognitive disturbances and memory loss, was the more significant contributor to petitioner's disabilities.

Although petitioner explained the demands and pressures of his job after the Saatchi and Saatchi take-over, Dr. Schulman concluded that job stress had not caused petitioner's psychological problems. Dr. Schulman was unable to determine the precise cause of petitioner's dementia, but he believed that "the probable causes included some type of metabolic disturbance."[3] In addition, Dr. Schulman found petitioner's work history, as relayed to him through petitioner, significant: petitioner had constantly been ambitious, aggressive, competitive and successful in his work, and nothing in his work ethic or lifestyle changed between 1951 and 1986. Dr. Schulman conceded that if a person is put in a job in which he feels overwhelmed—if he perceives a discrepancy between his

2. Anxiety attacks were described as "a discrete experience of fear or dread or doom, that is accompanied by a variety of hostile physical symptoms[, f]or example, nausea, sometimes vomiting, sweating, rapid heartbeat, sometimes palpitations, rapid breathing or inability to catch one's breath, feelings of weakness or lightheadedness [sic]." A severe panic attack was described as when "one feels like one's going to die."

3. Dr. Schulman later learned that at the time of the examination petitioner was in the midst of a negative reaction to anti-depressant medication prescribed by Dr. Eden. In Dr. Schulman's opinion, the reaction to the medication accounted for the dementia symptoms. Nonetheless, this revelation did not alter Dr. Schulman's conclusion that petitioner's symptoms were not job-related.

ability and the demands of the job—he experiences stress. Dr. Schulman opined, however, that petitioner felt none of that.

In Dr. Schulman's opinion, petitioner became depressed as a result of experiencing chest pain in June 1986. Dr. Schulman contended that this "heart attack,"[4] combined with petitioner's fear of heart disease, threw petitioner into a panic state, aggravating his underlying cardiovascular disease and creating psychological stress that further disrupted his emotional stability. Dr. Schulman added that a person's "personality, family and constitutional make-up all play a role" in whether somebody becomes seriously depressed and that all of the stresses in one's life contribute to the intensity of emotional depression.

The Hearing Examiner found that petitioner was in a state of deep depression, but that his depression did not arise out of his employment. The Hearing Examiner was "persuaded by Dr. Schulman that the depression [petitioner] is now claiming is not attributable to his job," *Spartin v. The Hay Group*, H & AS No. 88-96, Compensation Order at 3 (June 24, 1988) (unpublished) (Order). She discredited the testimony of Drs. Eden and Kehr because there are "no objective findings to support their findings." *Id.* Thus, she concluded that petitioner had not met his burden of demonstrating that the actual conditions of employment, as determined by an objective standard and not merely the petitioner's subjective perception of his working conditions, caused the emotional injury.

Petitioner appealed to the Director of the DOES who decided that the Hearing Examiner's findings were supported by substantial evidence in the record, that petitioner had received the benefit of the statutory presumption of compensability, and that the Hearing Examiner had applied the correct legal standard to determine whether petitioner's disability was compensable. *Spartin v. The Hay Group*, H & AS No.

88-96, Decision of the Director (June 19, 1989) (unpublished) (Decision). Petitioner timely appealed to this court.

## II

Petitioner contends that the agency applied an "inappropriate test for determining whether [he] suffered a compensable injury." According to petitioner, the agency mistakenly used the standard from *Dailey v. 3M Co. and Northwest Nat'l Ins. Co.*, H & AS No. 85-259 (Final Compensation Order May 19, 1988). In *Dailey*, the Director set forth a special standard for cases of emotional injury caused by job stress:

> [I]n order for a claimant to establish that an emotional injury arises out of the mental stress or mental stimulus of employment, the claimant must show that actual conditions of employment, as determined by an objective standard and not merely the claimant's subjective perception of his working conditions, were the cause of his emotional injury. The objective standard is satisfied where the claimant shows that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury.

*Id.* at 5-6 (footnote omitted). Petitioner contends that the *Dailey* test is inconsistent with the Workers' Compensation Act and with public policy.

Although the "general rule of causation" in workers' compensation cases is to be "liberally construed," *Capital Hilton Hotel v. District of Columbia Dep't of Employment Servs.*, 565 A.2d 981, 985 (D.C. 1989), the Director has crafted special standards for certain types of claimed injuries. *See, e.g., id.* (noting that "[t]he Director adopted a special standard applicable to claimants who had a preexisting arteriosclerotic condition at the time" they suffer heart attacks).[5] The *Dailey* test is such a special standard.

---

4. Dr. Schulman mistakenly believed that petitioner had actually experienced a heart attack in June 1986, and that petitioner suffered from heart disease.

5. This court has on four occasions reserved the question whether the special standard for heart attack victims with a preexisting heart condition is consistent with the Workers' Compensation Act. *See Capital Hilton, supra*, 565 A.2d at 986;

Viewed generally, insofar as it requires an objective demonstration of job stressors, *Dailey* fits within the modern trend to compensate workers for emotional injury caused by job stress. *See generally* 1B A. LARSON, WORKMEN'S COMPENSATION LAW [hereinafter LARSON] §§ 42.23, 42.25 (1987) at 7–639 (describing the "distinct majority position supporting compensability" for such cases).[6] Professor Larson advocates an "objective" standard for such cases that is very similar to the *Dailey* test: "in order for non-traumatically caused mental injury to be compensable in a workmen's compensation case, the injury must have resulted from a situation of greater dimensions than the day-to-day mental stress and tensions which all employees must experience." 1B LARSON, *supra*, § 42.23(b) at 7–669 (quoting *School Dist. v. ILHR Dep't*, 62 Wis.2d 370, 215 N.W.2d 373 (1974)).[7] This court's decision in *McEvily v. District of Columbia Dep't of Employment Servs.*, 500 A.2d 1022 (D.C.1985), is also arguably consistent with the *Dailey* standard.[8]

In any event, neither the Hearing Examiner nor the Director applied the standard properly. The *Dailey* test is objective: it focuses on whether the stresses of the job were so great that they could have caused harm to an average worker. As the Director explained in *Dailey*, job stresses are to be "measured against the usual stressors or mental stimuli of employment in general." *Dailey, supra,* at 6 n. 2. Thus, a claimant must show under the *Dailey* test that his current job conditions are unusually stressful as compared to employment conditions in general, not as compared to his work history.

The agency, by contrast, devoted much of its discussion to the prior work history of petitioner, which is simply irrelevant to the *Dailey* analysis. *See Spartin v. The Hay Group, supra,* Compensation Order at 3 (focusing on petitioner's "prior work history [which] consisted of aggressive, high energy, and very responsible positions"); *id.,* Decision of the Director at 4 (adding that petitioner is "a very driven, dedicated

*Jones v. District of Columbia Dep't of Employment Servs.*, 519 A.2d 704, 709 (D.C.1987); *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 506 A.2d 1127, 1130 n. 5 (D.C.1985); *George Hyman Constr. Co. v. District of Columbia Dep't of Employment Servs.*, 497 A.2d 103, 106 n. 2 (D.C. 1985).

**6.** *See, e.g., National Red Cross v. Hagen*, 327 F.2d 559 (7th Cir.1964) (compensable mental illness causally related to job stress arising from location in Japan, personal problems, extra work during supervisor's illness, and conflict with local chaplain over who was to advise servicemen of death in their families); *Fireman's Fund Ins. Co. v. Industrial Comm'n,* 119 Ariz. 51, 579 P.2d 555 (1978) (after working as underwriter for 15 years, employer's volume tripled and respondent subject to greater responsibility and mounting stress, causing nervous breakdown, held compensable since unexpected nature of either the cause or the result is sufficient for accidental injury); *Gamble v. New York State Narcotics Addict Control Comm'n,* 60 A.D.2d 703, 400 N.Y.S.2d 599 (1977) (affirming agency award to worker who "sustained a psychic trauma resulting from his job change" and then committed suicide). *See also Joseph Albanese's Case,* 378 Mass. 14, 389 N.E.2d 83 (1979) (foreman for 20 years, employer's business sold to new owner, and shop unionized with resulting friction, causing mental or emotional disorder, held compensable since disorder not the result

of normal wear and tear since claimant on job for 17 years without incident and suffered disorder only after the change in ownership and shop unionization). Massachusetts, however, appears to allow compensation for mental injuries as a result of stressful work related incidents regardless of whether a reasonable person would have suffered the injury. *See Kelly's Case,* 17 Mass.App.Ct. 727, 462 N.E.2d 348 (1984), *aff'd,* 394 Mass. 684, 477 N.E.2d 582 (1985).

**7.** *See, e.g., McGarrah v. State Accident Ins. Fund,* 59 Or.App. 448, 651 P.2d 153 (1982), *aff'd* 296 Or. 145, 675 P.2d 159 (1983) (adopting test that stressful conditions of job must be those to which average worker would respond rather than conditions which a particular claimant might view as stressful due to a subjective personality disorder; standard requires that work related stressful conditions must be a major contributing cause of the disorder, ruling out non-job related sources of stress).

**8.** In *McEvily,* this court affirmed a DOES decision denying benefits to a claimant who suffered from emotional disabilities. We mentioned the testimony of Dr. Schulman (who also testified in the instant case): "Dr. Schulman could not find any incident, experience or ongoing occurrence that represented a *significant stressor that would have affected anyone who was not so predisposed." McEvily, supra,* 500 A.2d at 1023 (emphasis added).

person and somewhat of a perfectionist"). The stresses of petitioner's job, viewed objectively in comparison with those stresses which face an average worker, do not depend in any way on how "aggressive," "high energy" or "driven" petitioner may have been in the past or present. By relying on petitioner's work history of stressful jobs, the agency would seem to rule out recovery for those who have a history of particularly stressful working conditions. Such a result is in direct conflict with *Dailey*'s recognition that "there are clearly occupations or specific jobs which routinely or frequently expose its [sic] workers to unusual or uncommon stressors or mental stimuli when measured against the usual stressors or mental stimuli of employment in general." *Dailey, supra,* at 6 n. 2.[9] On remand, upon applying the *Dailey* test the Hearing Examiner should evaluate petitioner's job stresses in accordance with the objective standard.[10]

Further, the *Dailey* test states that "a work related aggravation of a pre-existing condition can be compensable under the law of workers' compensation." *Dailey, supra,* at 9. The court has previously mentioned in the context of another, similar statute that recovery for aggravation of a prior condition may be appropriate in cases of emotional injury caused by job stress. *See Allen v. District of Columbia Police & Firefighters' Retirement & Relief Bd.,* 528 A.2d 1225, 1233 (D.C.1987) (Rogers, J., concurring) (reserving the question whether stressful "workplace occurrences would constitute [compensable] aggravation" of a previous condition); *see also* 1B LARSON, *supra,* § 42.23(c) at 7–670 (advocating that "aggravation of a preexisting weakness or disease is a compensable injury" even when the weakness is psychological and the inju-

ry is caused by job stress, and citing three opinions by the Michigan Supreme Court in 1975 as the leading precedent in this area). Although recovery for aggravation of a preexisting condition may seem incompatible with the *Dailey* test's focus on a hypothetical employee who is not "predisposed" to injury, we do not read *Dailey* to preclude recovery where a claimant comes to the job with a preexisting psychological condition. Under *Dailey,* an employee predisposed to psychic injury could recover if he is exposed to work conditions so stressful that a normal employee might have suffered similar injury. Thus, an employee with a predisposition to mental illness is not precluded from recovering under *Dailey.* Only when so interpreted is the *Dailey* standard compatible with the Workers' Compensation Act.

In the instant case the Hearing Examiner relied on Dr. Schulman's conclusion that petitioner's psychological problems were organic. Given the other evidence of petitioner's stressful work conditions, the Hearing Examiner erred in failing to consider whether petitioner's job aggravated any preexisting organic condition. Nothing in Dr. Schulman's opinion would preclude such a finding.

Accordingly, since the agency failed to apply the objective *Dailey* standard and to consider aggravation, a remand is required.

### III

■ Petitioner also contends that the agency decision is based on insufficient evidence. "Both statute and case law require the findings of an administrative agency to be supported by substantial evidence on the record considered as a whole." *Allen v.*

---

**9.** This is not to say that the agency may not consider petitioner's successful coping with job stress in the past in determining whether the injury "arose out of" the change in his working conditions. We note, however, that a worker's compensation claimant need not prove that his employment was the sole cause of his disability. *See* 1 LARSON, *supra,* § 7.40 at 3–14 ("The law does not weigh the relative importance of the two causes, nor does it look for primary and *secondary causes; it* merely inquires whether the employment was a contributing factor. If it

was, the concurrence of the personal [non-employment] case will not defeat compensability").

**10.** The Director is, of course, free to modify the *Dailey* standard in subsequent decisions, limited by the legislative purpose that the Workers Compensation Act "is to be construed liberally for the benefit of employees and their dependents." *Ferreira v. District of Columbia Dep't of Employment Servs.,* 531 A.2d 651, 655 (D.C. 1987).

*District of Columbia Rental Hous. Comm'n,* 538 A.2d 752, 753 (D.C.1988). An agency decision must rest on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (citations omitted)).

The Hearing Examiner relied expressly on Dr. Schulman's testimony as the basis for her decision. *See Spartin v. The Hay Group, supra,* Compensation Order at 3 ("I am persuaded by Dr. Schulman that the depression claimant is now suffering is not attributable to his job"). At no point did the Examiner attempt to resolve several problems with Dr. Schulman's testimony. Dr. Schulman testified on the basis of an incorrect, critical factual assumption that petitioner had suffered a heart attack.[11] In fact, petitioner did not experience a heart attack or suffer from heart disease, although he did have chest pains which gave him concern. Dr. Schulman's conclusions about the true cause of petitioner's depression must be evaluated with his apparent misconceptions in mind.

In Dr. Schulman's opinion, the cause of petitioner's depression was "that the man fell apart as a result of having chest pain." Dr. Schulman concluded that petitioner's chest pain in turn was caused by heart problems. Dr. Schulman does not seem to have considered the possibility that petitioner's chest pains were themselves caused by job stress, or, for that matter, by the worries which a criminal investigation might be expected to generate. If Dr. Schulman had been aware that petitioner's chest pain was not caused by heart disease, he might very well have arrived at a different conclusion about the ultimate cause of petitioner's emotional injuries. *Cf. Baker v. Workmen's Compensation Appeals Bd.,*

18 Cal.App.3d 852, 859–62, 96 Cal.Rptr. 279, 282–84 (1971) (recognizing the validity of a claim for workers' compensation recovery based on "cardiac neurosis" caused by the stresses and anxieties of employment).

■ The Hearing Examiner did not address any of these problems with Dr. Schulman's testimony.[12] Indeed, the Hearing Examiner's conclusions include only the cryptic statement that Dr. Schulman's opinion was "well reasoned." *Spartin v. The Hay Group,* Compensation Order at 3. Generally an agency need not specify why it credits one witness over another. *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36 (D.C.1979). But when a party questions the fundamental factual bases for an expert opinion, the Hearing Examiner must offer some explanation for why the expert's conclusions are nonetheless credible. *See Draude v. District of Columbia Bd. of Zoning Adjustment,* 527 A.2d 1242 (D.C. 1987) (holding that the agency "must reach sufficiently detailed findings on basic factual issues to demonstrate that it has considered and ruled upon each of the party's contentions"). A summary conclusion that the expert opinion is well-reasoned is insufficient to allow a reviewing court to conclude that the decision "follow[ed] rationally from the findings" of fact. *Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401, 402 (D.C.1984). On remand the Hearing Examiner must therefore address the problems which we have enumerated before relying on Dr. Schulman's testimony as the basis for a decision. The Hearing Examiner is, of course, free to credit other testimony on remand, including the evidence that the Department of Justice investigation may have contributed to petitioner's medical problems. Even if the Hearing Examiner

11. Dr. Schulman also testified under the assumption that petitioner's wife's medical problems (which Dr. Schulman believed contributed to petitioner's depression) occurred in 1985. In fact, the medical problems were resolved in 1980, although Dr. Kehr's letters indicate petitioner remained concerned about them. Dr. Schulman did not base his ultimate conclusions on this misconception, however.

12. At the hearing petitioner presented testimony from Dr. Kehr explaining these weaknesses in the foundation for Dr. Schulman's views. Moreover, petitioner reiterated these concerns in final argument.

concludes, contrary to petitioner's account, that the investigation was an important factor, however, the Examiner would still have to determine whether petitioner's disability arose out of his employment. *See Ferreri v. General Auto Driving School, Inc.*, 26 A.D.2d 601, 271 N.Y.S.2d 421 (1966) (affirming award of benefits to driving instructor who suffered injury after stressful investigation by the state department of motor vehicles); *see also Hamilton v. Transp. Workers Union of Greater New York, Local 100*, 21 A.D.2d 434, 251 N.Y.S.2d 104 (1964); *Donato v. Pantry Pride (Food Fair)*, 37 Conn.Sup. 836, 438 A.2d 1218 (1981).

## IV

■ Finally, petitioner claims that the agency failed to give him the benefit of the statutory presumption of compensability. The D.C. Workers' Compensation Act includes a statutory presumption of compensability: "it shall be presumed, in the absence of evidence to the contrary: [t]hat the claim comes within the provision of this chapter...." D.C.Code § 36–321(1) (1988 Repl.). The presumption is "designed to effectuate the humanitarian purposes of the statute" and "reflects a 'strong legislative policy favoring awards in arguable cases.'" *Ferreira, supra* note 10, 531 A.2d at 655 (quoting *Wheatley v. Adler*, 132 U.S.App.D.C. 177, 183, 407 F.2d 307, 313 (1968) (en banc)), *quoted in Parodi v. District of Columbia Dep't of Employment Servs.*, 560 A.2d 524, 525–26 (D.C. 1989).

In order to invoke the presumption, a claimant must provide "some evidence of the existence of two 'basic facts': [1] a death or disability and [2] a work-related event, activity, or requirement which has the *potential* of resulting in or contributing to the death or disability." *Ferreira, supra*, 531 A.2d at 655 (emphasis in original), *quoted in Parodi, supra*, 560 A.2d at 526. If the claimant satisfies this threshold requirement, "the burden of production shifts to the employer." *Parodi, supra*, 560 A.2d at 526. "Absent employer evidence 'specific and comprehensive enough

to sever the potential connection between a particular injury and a job-related event,' the compensation claim will be deemed to fall within the purview of the statute." *Id.* (citing *Ferreira, supra*, 531 A.2d at 655).

Petitioner argued before the Director that the Hearing Examiner failed adequately to apply the statutory presumption of compensability. The Director rejected this claim, reasoning that:

> claimant did in fact receive the benefit of the presumption, as he presented evidence of a work-related injury. However, after the presumption arose, employer produced evidence showing that claimant's injury did not arise out of employment. Thus, employer met its burden by presenting evidence to overcome the presumption of compensability. As a result, each side had to present and argue its case, and the Hearing Examiner, as fact finder, determined that employer's arguments were more persuasive.

*Spartin v. The Hay Group, supra*, Decision of the Director at 3. The Director thus concluded that petitioner had made the threshold showing to trigger the presumption, but that the employer had presented evidence sufficient to rebut it. The Director seems to have reasoned that the Hearing Examiner did not need to spell out exactly how the presumption operated in the case; as long as the record could support a decision in which the presumption had been properly applied, the Director would affirm.

In any contested case a hearing examiner's decision must include "findings of fact and conclusions of law." D.C.Code § 1–1509(e) (1981). "This court has refashioned these requirements into a three-part test for administrative decisions in contested cases: (1) the decision must state findings of fact on each material contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must follow rationally from the findings." *Perkins, supra*, 482 A.2d at 402. When the agency fails to make a finding on a material contested issue, "this court cannot fill the gap by

making its own determination from the record, but must remand the case for findings on that issue." *Davis v. District of Columbia Dep't of Employment Servs.*, 542 A.2d 815, 819 (D.C.1988).

In the instant case the presumption of compensability was a material legal issue that should have been addressed by the Hearing Examiner. On appeal the intervenors contend that the Hearing Examiner's order should be read as concluding that petitioner "failed to produce the minimum evidence necessary to invoke the presumption." This characterization of the Hearing Examiner's conclusions is directly contrary to the Director's reading, and is difficult to square with the record. *See infra* note 13. In any event, the fact that the Director and the intervenors could offer such different interpretations of the Compensation Order demonstrates that the Hearing Examiner's decision is lacking the requisite clarity.

Because of our conclusions with respect to petitioner's other claims, however, we need not decide whether the Director's interpretation reflects a misconception regarding the application of the presumption of compensability. *Parodi, supra*, 560 A.2d at 526. Petitioner clearly presented sufficient evidence to trigger the presumption.[13] Once triggered, the presumption would have required the employer to produce " 'substantial evidence' showing that the death or disability is not work-related." *Id.* (quoting *Ferreira, supra*, 531 A.2d at 655 & n. 5). On remand, the Hearing Examiner should make findings on: (1) whether petitioner satisfied the "initial demonstration" of basic facts necessary to trigger the presumption; and (2) if so, whether the employer presented "substantial evidence" demonstrating that petitioner's disability did not arise out of his employment.

## V

In sum, petitioner's claim for benefits raised difficult and complex issues for the Hearing Examiner to resolve in a manner consistent with the statutory purpose, the statutory presumption, and the objective *Dailey* test allowing compensation for aggravation of a preexisting condition. Neither the presumption nor the *Dailey* test are easily applied here, but ignoring the complexities with conclusory statements clearly will not suffice.

Accordingly, the case is remanded to the agency for proceedings consistent with this opinion.

---

13. As the intervenors concede, petitioner has clearly suffered psychological injury. He has also pointed to stressful job conditions which could easily have caused his injury. Moreover, petitioner introduced testimony of two experts who claimed that his job caused his injury.