**Collis E. PORTER, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,**

**George Washington University and Liberty Mutual Insurance Company, Intervenors.**

**No. 92–AA–259.**

District of Columbia Court of Appeals.

Argued April 26, 1993.

Decided May 27, 1993.

---

887

Collis E. Porter, pro se.

Donald P. Maiberger, Rockville, for intervenor.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Petitioner Collis Porter seeks review of the denial by the District of Columbia Department of Employment Services

(DOES) of her claim for disability compensation under the District of Columbia Workers' Compensation Act of 1979, as amended, D.C.Code § 36–301 *et seq.* (1988). Petitioner was struck by a gurney (a wheeled cot or stretcher) while performing her duties as a nursing assistant at George Washington University Hospital. Following an evidentiary hearing, the DOES hearing examiner found that petitioner's resulting physical injury had been treated successfully and resolved, and that her current disability was not causally related to the accident, but rather stemmed from a pre-existing personality disorder. She therefore held that petitioner was not entitled to compensation. The Director of DOES affirmed the examiner's decision. Our task on review "is limited to determining whether the Director's order is in accordance with law and supported by substantial evidence in the record." *King v. District of Columbia Dep't of Employment Servs.,* 560 A.2d 1067, 1072 (D.C.1989). That inquiry, however, requires that we first identify the standard of causation applied by the examiner and the Director.[1]

■ Petitioner claimed that her present disability was a post-traumatic stress disorder, a serious personality disturbance traceable directly to the gurney accident on the job. Her primary witness in support of this theory was Dr. Ralph Wadeson, a board-certified psychiatrist. The employer/intervenors countered with testimony (via deposition) by Dr. Bruce Smoller, also a board-certified psychiatrist, that petitioner's present condition of severe depression had not been caused by the gurney accident, but stemmed from a pre-existing hys-

terical/hypochondriacal personality disorder marked by cyclothymic features, *i.e.,* "up and down" shifts in mood.

In *McEvily v. District of Columbia Dep't of Employment Servs.,* 500 A.2d 1022 (D.C.1985), this court considered the agency's rejection of a claim for workers' compensation not unlike the present one. In that case the hearing examiner credited testimony by the intervenor's examining psychiatrist that the petitioner's present "depressive reaction" stemmed from a pre-existing "cyclothymic disorder ... and a narcissistic personality disorder," rather than from conditions of his work. *Id.* at 1023. In sustaining the examiner's finding that the depression did not arise out of the petitioner's employment,[2] both the Director and the court implicitly approved the test for causation reflected in the psychiatrist's evaluation:

> Dr. Schulman could not find any incident, experience, or ongoing occurrence that represented a significant stressor *that would have affected anyone who was not so predisposed* [to the depressive reaction]. He concluded that there could be no reasonable assessment of job-related stress, because the nature of that stress was highly subjective to petitioner.

*Id.* (emphasis added).

Subsequently, in *Spartin v. District of Columbia Dep't of Employment Servs.,* 584 A.2d 564 (D.C.1990), the agency employed a similar "standard for cases of [alleged] emotional injury caused by job stress," *id.* at 568, in considering the claim of an executive consultant that stressful job conditions had caused him to become

1. The hearing examiner who entered the compensation order was not the examiner who conducted the hearing and heard the testimony. (The latter had left the agency's employment in the meantime.) But, while decisions of a hearing examiner "are to be given *special* weight when they depend upon demeanor of witnesses," *Dell v. District of Columbia Dep't of Employment Servs.,* 499 A.2d 102, 106 (D.C.1985) (emphasis added; citation omitted), the deference implicit in our "substantial evidence" standard of review rests on more than the examiner's ability to assess demeanor evidence. *Cf. Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518

(1985). Moreover, when it became apparent that a new hearing examiner would have to render the compensation decision, petitioner's counsel in the administrative proceedings agreed that the new examiner could decide the case upon the record already constituted. Hence we apply our customary, limited standard of review of the agency's decision.

2. To be compensable under the Workers' Compensation Act, an accidental injury or death must be one "arising out of and in the course of employment...." D.C.Code § 36–301(12) (1988).

disabled by depression and other psychological illnesses. As in *McEvily*, the intervenor's psychiatrist had concluded that job stress was not responsible for the petitioner's emotional illness. In analyzing the evidence of causation, the Director applied a test derived from the agency's earlier decision in *Dailey v. 3M Co. & Northwest Nat'l Ins. Co.*, H & AS No. 85–259 (May 19, 1988), under which, as this court explained,

> an employee predisposed to psychic injury could recover if he is exposed to work conditions *so stressful that a normal employee might have suffered similar injury.* Thus, an employee with a predisposition to mental illness is not precluded from recovering under *Dailey.*

*Spartin*, 584 A.2d at 570 (emphasis added). We recognized that the *Dailey* test "fits within the modern trend to compensate workers for emotional injury caused by job stress" even though they bring to the job some predisposition to emotional illness, but that the test "is objective: it focuses on whether the stresses of the job were so great that they could have caused harm *to an average worker.*" *Id.* at 569 (emphasis added). While we rejected the petitioner's argument that the *Dailey* test was an "inappropriate [one] for determining whether [petitioner] suffered a compensable injury," *id.* at 568, we remanded for further consideration because of (*inter alia*) faults in the agency's application of "the objective *Dailey* standard...." *Id.* at 570.

In the present case, the hearing examiner did not expressly apply the *Dailey* test or inquire, in *McEvily*'s language, whether petitioner had been involved in an "incident [or] experience ... represent[ing] a significant stressor that would have affected anyone who was not so predisposed"—*i.e.*, *Dailey's* "average worker."[3] Yet in essence that is the test the examiner applied. She found that petitioner's current depressive condition "was not causally related to her ... work injuries," which had resulted in no "objective evidence" of continued disability; rather, it was "related solely to her hysterical/hypochondriacal personality dis-

order." The Director likewise concluded that petitioner's "alleged stress/psychological disorder was not work-related" because no "specific, articulable source" rooted in the job, no "concrete *non-personal* stressors" (emphasis added), had been identified as its cause. Both the examiner and the Director concluded, in other words, that the gurney accident would not have caused a person lacking petitioner's subjective, preexisting personality disorder to suffer the disability she now experienced.

As in *Spartin*, we perceive no reason here why the agency's application of an objective causal test to petitioner's claim of emotional injury is inconsistent with the Workers' Compensation Act. As one court has pointed out,

> In cases where the disability or impairment is established, [a contrary] subjective test for causal nexus would result in an award of compensation for virtually all, if not all, claims based on mental disorders. If the claimant perceived that the job conditions caused the mental disorders, *even if this were not true,* the employer would be liable. [A] subjective formulation ignores the fundamental statutory requirement that diseases or disorders arise out of and in the scope of employment.

*McGarrah v. SAIF*, 296 Or. 145, 675 P.2d 159, 171 (1983) (emphasis in original). Nor is it decisive that petitioner, unlike the claimant in *Spartin*, cites a specific job-related accident as the cause of her disorder rather than less easily identified conditions of *stress* in the employment. Whatever the triggering event or condition, the Director may properly apply a rule for causation in this difficult area of emotional injury that discourages spurious claims— one focusing on the objective conditions of the job and their effect on the "normal employee" not predisposed to the injury by a mental disorder.

Our remaining inquiry, therefore, is whether there is substantial evidence in the

---

**3.** That the examiner did not purport to rely on *Dailey* is not surprising since the compensation order in that case was not issued until some three months after the examiner issued his order in this case.

record which supports the examiner's decision that the gurney accident did not cause petitioner's disabling depression. We conclude that there was. First, the examiner had before him the deposition testimony of Dr. Smoller, Medical Director of the Bethesda Pain Center, who took a complete history of petitioner, reviewed her prior medical records, and performed a physical and psychiatric examination of her. He concluded that petitioner "had a personality disorder consisting of a hysterical personality with cyclothymic features," which "predisposed [her] to seeing her injury as the focus of a series of events which she believes is disabling her." Dr. Smoller could find no residual "objective evidence, [no] damage" stemming from the job accident; rather, petitioner's "personality disorder made it seem to [her] that her symptoms were of greater magnitude than one could find organically...." Petitioner was "turning psychological material into physical," and thus "was predisposed to continuing [to] see[ ] her injury as disabling." Dr. Smoller could find no evidence of "a life threatening trauma" sufficient to support a diagnosis of post-traumatic stress disorder.

Second, Dr. Smoller's opinion that there was no objective, organic basis for petitioner's disability was supported by the reports of various specialists—including a thoracic surgeon, an internist, a rheumatologist, and a·neurosurgeon—who examined petitioner in the several years following the accident. They ascribed varying diagnoses to her condition, but most agreed that by the time petitioner's treatment had concluded there was little objective basis for her complaints, or, at least, that her complaints were in excess of what would be expected from her limited physical injury.[4]

Third, the report and testimony of Dr. Ronald Wynne, a clinical psychologist retained by petitioner to conduct a psychological evaluation, partially corroborated Dr. Smoller's opinion. While agreeing with petitioner's psychiatric witness Dr. Wadeson that petitioner suffered from post-traumatic stress disorder, Dr. Wynne also agreed with Dr. Smoller that petitioner had a pre-existing personality disorder that included histrionic and hypochondriacal features. He found that petitioner "has a tendency to decompensate somewhat in the face of illness and stress. She ... put[s] problems into her body ... The accident built on this foundation, heightening and exaggerating pre-existing tendencies...."[5]

Finally, Dr. Wadeson's contrary testimony that petitioner's post-traumatic stress disorder was not causally linked to an underlying personality disorder was problematical, as the Director recognized in her decision. In Dr. Wadeson's opinion, "the [gurney] accident on the job caused the post traumatic stress disorder which [peti-

---

**4.** For example, on October 24, 1985, Dr. Hix, a thoracic surgeon, diagnosed petitioner as having a possible hematoma or fracture, opining that "the injury was painful, but not serious, and that she would not harm herself nor impede healing by resuming her normal activities ... [but that] she seems quite distraught about the condition." On November 7, 1985, he noted that she was less symptomatic and did not evidence any significant tenderness of the chest area, and that "it was safe for her to return to work."

Petitioner was admitted to the George Washington University Hospital on January 8, 1986 for back pain. She was given a lumbosacral corset and cane and discharged on January 24, 1986, with orthopaedist Dr. Wiesel noting that "[s]he underwent exhaustive testing with a CAT scan, myelogram, neurologic and neurosurgical consults and there was no mechanical problem found to account for her back pain."

Finally, a neurologist, Dr. Stevens, examined petitioner in early 1987 and concluded that there were no objective signs of injury and no neurologic sequelae. He concluded that it would be in petitioner's best interests to return to work as soon as possible.

**5.** Dr. Wynne testified:

[i]f something happens to [petitioner], instead of developing a psychological symptom, she develops a bodily symptom. She acts out her emotional problems inside her body. She is very tuned into her body, very tuned into bodily problems....

\* \* \* \* \* \*

She has this tendency to sort of park emotional problems in her body, to focus on what is going on inside her body, to assume that something is going on there that must be wrong, to become anxious about it. The anxiety has kind of fed on itself so that there are just all sorts of things in her life right now which essentially have her emotionally immobilized. The data from the different measures support that.

tioner] now experiences." Dr. Wadeson agreed that a diagnosis of post-traumatic stress disorder requires the occurrence of a causative event "catastrophic" to the person involved. He then defined the gurney accident as such an event substantially because of the disability it had produced: "Any injury that takes away a person's livelihood is a catastrophic experience." The Director recognized the ambiguity in this conclusion by pointing out that "Dr. Wadeson's analysis lacked any concrete *non-personal* stressors correlating the injury and the work environment to post traumatic stress disorder" (emphasis added).[6]

*Affirmed.*

---

[6]. Even if Dr. Wadeson's testimony were fully credited, moreover, we have stated that, "[w]here there is substantial evidence to support the Director's findings, ... then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Director." *McEvily,* 500 A.2d at 1024 n. 3.