Cora M. GARY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent.

Washington Metropolitan Area Transit
Authority, Intervenor.

No. 95–AA–1359.

District of Columbia Court of Appeals.

Argued Oct. 29, 1996.
Decided Dec. 30, 1998.

Benjamin T. Boscolo, Greenbelt, MD, for
petitioner.

Alan D. Sundburg, with whom Gerald Herz, Washington, DC, was on the brief, for intervenor.

Charles F.C. Ruff, Corporation Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before TERRY and RUIZ, Associate Judges, and PRYOR, Senior Judge.

TERRY, Associate Judge:

Petitioner Cora Gary filed a claim for benefits under the District of Columbia Workers' Compensation Act, D.C.Code §§ 36–301 *et seq.* (1997), based on emotional injuries she allegedly suffered in the course of her employment by the Washington Metropolitan Area Transit Authority (WMATA). She sought temporary total disability benefits and continuing payment of medical bills for alleged work-related and work-induced stress. After an evidentiary hearing, a hearing examiner of the Department of Employment Services (DOES) issued a compensation order denying her claim, on the ground that she had failed to demonstrate that her working conditions could have caused a similar emotional injury in a person not predisposed to such injury, and that her condition therefore did not arise "out of and in the course of" her employment, as required by D.C.Code § 36–301(12).

Ms. Gary sought review of the examiner's decision by the Director of DOES. When the Director failed to issue a decision within forty-five days from the date of her application, she filed a timely petition for review in this court.[1] Before us she contends that the examiner's findings of fact were not based upon substantial evidence and that he misapplied

the law in determining that her injury was not compensable. We affirm.

I

A. *The Events of June 1992*

Ms. Gary was employed by WMATA as a stock clerk and was responsible for preparing accounts, taking inventory of materials, and pulling materials to be shipped out to other WMATA facilities. On June 1, 1992, she examined her office's master calendar of "days off" for employees and noticed that her name was not on the calendar for June 5, although she had previously requested leave for that day in order to attend her daughter's graduation from high school. Upon seeing that her name was not on the calendar, Ms. Gary promptly requested leave for June 5 from her supervisor, Nancy Tompkins.[2] Ms. Tompkins, however, denied her request because Ms. Gary had previously used all of her allotted leave time, and because there would not be sufficient coverage of the office if Ms. Gary were absent. Both Ms. Gary and Ms. Tompkins raised their voices during the confrontation, and, according to Ms. Tompkins, Ms. Gary "became loud and boisterous and [used] profanity." Ms. Tompkins testified that Ms. Gary then returned to the stock room and, in the presence of other employees, repeatedly called Tompkins a vulgar name (which we need not repeat here).

Ms. Gary then went to the manager of her division, Kenneth Crane, who also denied her request for leave. Next, she approached Michael Kurtz, WMATA's director of maintenance and support, who had supervisory authority over both Ms. Tompkins and Mr. Crane. Ms. Gary testified that she was "very upset and ... shaking and crying" when she spoke to Mr. Kurtz. After he too declined to grant her request for leave,[3] Ms.

---

1. D.C.Code § 36–322(b)(2) provides in part:

   Application for such review [by the Director of DOES] shall be made by any party within 30 days from the date a compensation order is filed .... Final decisions issued pursuant to such review shall be rendered within 45 days from the date of the application and shall be based upon the record of the hearing. If a final decision is not rendered within such 45–day period the compensation order shall be considered a final decision for purposes of

appeal [to the District of Columbia Court of Appeals].

2. Ms. Gary testified that she had initially requested leave for June 5 almost a month earlier and had reminded Ms. Tompkins of that request on several occasions.

3. In his deposition, Mr. Kurtz testified that although he denied Ms. Gary's request when she came to him, he also told her that he "would use the resources [he] had available" to find a way to give her the day off if he could possibly do so.

Gary left his office, saying, "I just can't take any more of this." From there she went to WMATA's health unit, where she was advised not to return to work until she had a "written release to work" from her treating psychiatrist.

Ms. Gary returned to work on June 9 with the consent of her psychiatrist, Dr. James Ryan. She testified that soon after she arrived, Ms. Tompkins began "talking ... real mean and hateful" and "badgering" her because she "wasn't working fast enough." Ms. Gary became upset and called Dr. Ryan, who advised her to leave the job immediately. She ultimately resigned from her position at WMATA in January 1993.

### B. *Ms. Gary's Psychiatric History*

The evidence showed that there were several stressors in Ms. Gary's life which antedated the June 1992 incidents and formed the basis of her pre-existing psychiatric condition. Ms. Gary testified that she had been the victim of sexual harassment on the job in February 1990, and that she and her husband began having marital difficulties soon thereafter. The problems with her husband culminated in her filing an assault charge against him because he had allegedly threatened her life.[4] Ms. Gary also stated that she had suffered from a bleeding ulcer since 1991 and was regularly taking medication for it.

Dr. James Ryan treated Ms. Gary from March 1990 to July 1992, initially in response to her alleged sexual harassment by a WMATA supervisor. When Ms. Gary first went to Dr. Ryan, she was "in a very disturbed state, very restless, very anxious, [and] pacing around the office." After this visit, Dr. Ryan initially diagnosed her as suffering from an incipient stress disorder and a high anxiety disorder. He advised her to stay away from work because "any contact with work at that time would arouse more rage." He also prescribed a tranquilizer (Valium) for her, to be taken three times a day. Dr. Ryan testified

that in April 1990 Ms. Gary experienced "a break with reality" that caused her to ride a bus to the end of the line and check into a motel there. While she was at the motel, a fire broke out in Ms. Gary's room, apparently as a result of her smoking in bed. She was taken to the Washington Hospital Center, where she "slipped ... into a state of depression" and had to remain for almost a month, being treated with anti-depressant medication.[5]

In July 1992 Ms. Gary was taken to Suburban Hospital in Bethesda, Maryland, after police found her trying to jump off a bridge. Upon her admission to the hospital, Ms. Gary began treatment with Dr. Juan Saavedra. Dr. Saavedra diagnosed Ms. Gary as suffering from major depression and post-traumatic stress disorder, initially triggered when she was sexually harassed at work in 1989. The doctor based his diagnosis on Ms. Gary's "suicide ideation, suicide attempts, inability to work, insomnia, lack of concentration, memory deficit, and a very high level of anxiety ...." He testified that Ms. Gary "had been treated ... with anti-depressant medication for some time."

### C. *Expert Testimony*

Dr. Brian Schulman examined Ms. Gary on three occasions at the request of WMATA. The first examination, in July 1992, was interrupted shortly after it began and had to be continued until August because Ms. Gary became "quite distraught, hysterical, crying, screaming, yelling, pouting, very loud, very angry ...." After the second examination in August, Dr. Schulman examined her again in April 1993 and also reviewed her various medical records from Drs. Ryan and Saavedra.

On the basis of his examinations and his review of her records, Dr. Schulman diagnosed Ms. Gary as suffering from a psychiatric condition which antedated June 1, 1992. The doctor testified that Ms. Gary had "a

---

4. Ms. Gary told her doctor that her husband "said he was going to kill me and he wanted me to get out because he did not want [me] in this house until I would die.... I am afraid of him killing me and my children. I suffered from him beating up on me. This has happened before,

and we ... went to court, and like a fool I dropped the charges."

5. Dr. Ryan was also aware that "charges" (not further specified) were filed against Ms. Gary as a result of the fire in the motel room.

very long preceding history of problems" before the June 1992 events, and that she was in "very tenuous emotional control." Dr. Schulman stated that he "did not believe that this [Ms. Gary's depression in August 1992] was at all related" to the June 1992 confrontation with Ms. Tompkins. He also said that Ms. Gary was "an extremely emotionally ill individual" and that her illness could not "in any way be construed as a stress response." [6]

Dr. Saavedra and Dr. Ryan were both called as witnesses by Ms. Gary. Dr. Saavedra testified that the June 1992 events and the resultant emotional injury would "probably not" have occurred but for Ms. Gary's pre-existing psychiatric history. Dr. Ryan opined that the June 1992 incidents "reopened the wound totally that had occurred because of her sexual harassment and because of the company's treatment of her subsequent to that time. It gave her a fresh stress disorder ... which actually led eventually to a severe depression and breakdown ...."

## II

■■■ The Workers' Compensation Act creates a rebuttable presumption that an employee's injury is compensable upon a showing by substantial evidence of a disability and a work-related event which had the potential to cause such a disability. *See Spartin v. District of Columbia Dep't of Employment Services,* 584 A.2d 564 (D.C.1990). In "appropriate circumstances," an emotional injury may be compensable under the statute. *Charles P. Young Co. v. District of Columbia Dep't of Employment Services,* 681 A.2d 451, 458 (D.C.1996). The special standard for determining when an employee may recover for an emotional injury that arose out of the mental stress of employment was articulated by the Director of DOES ten years ago and was later adopted by this court:

[I]n order for a claimant to establish that an emotional injury arises out of the mental stress or mental stimulus of employ-

ment, the claimant must show that actual conditions of employment, as determined by an objective standard and not merely the claimant's subjective perception of his working conditions, were the cause of his emotional injury. The objective standard is satisfied where the claimant shows that the actual working conditions could have caused similar emotional injury in a person who was not significantly predisposed to such injury.

*Spartin, supra,* 584 A.2d at 568 (quoting *Dailey v. 3M Co.,* H & AS No. 85–259, OWC No. 66512 (May 19, 1988)). An employee with a pre-existing psychological disability is not necessarily barred from recovery under the Act. However, the test for determining the compensability of an emotional injury is an objective one: the claimant must show "that the actual working conditions could have caused similar emotional injury in an individual who was not significantly predisposed to such injury." *Spartin, supra,* 584 A.2d at 568; *see Sturgis v. District of Columbia Dep't of Employment Services,* 629 A.2d 547, 552 (D.C.1993); *McEvily v. District of Columbia Dep't of Employment Services,* 500 A.2d 1022 (D.C.1985).

■■■ In this case it was uncontroverted that Ms. Gary had a pre-existing psychological condition characterized by acute anxiety and major depression. Drs. Saavedra and Ryan both testified that the events of June 1 and June 9, 1992, aggravated those conditions and that Ms. Gary suffered a psychological injury as a result. However, in order to be compensated under the Act, Ms. Gary must also show that her supervisor's actions in June 1992 could have caused a similar psychological injury in a person "not significantly predisposed to such injury." *Spartin, supra,* 584 A.2d at 568. It is in this respect that Ms. Gary's efforts fall short.

The hearing examiner reasonably determined that Ms. Gary had failed to show that what happened to her at work in June 1992 would have produced similar injuries in a person not suffering from her pre-existing

---

**6.** Dr. Schulman disagreed with Dr. Saavedra's diagnosis of post-traumatic stress disorder because Ms. Gary had not suffered an "unexpected life-threatening event." Instead, Dr. Schulman testified that she suffered from "a significant

underlying predisposition in the form of borderline personality disorder." Dr. Schulman concluded that the June 1992 incidents could not have produced Ms. Gary's "protracted psychiatric condition."

mental condition. First, the examiner had before him the testimony of Dr. Schulman, who stated that Ms. Gary's injuries could not reasonably be considered a response to the stress of the June 1992 events. Dr. Schulman stated that a person who was not suffering from Ms. Gary's pre-existing mental condition would not have been similarly injured by those events. His conclusions were based on multiple examinations of Ms. Gary, as well as a review of her medical records. His testimony was specifically credited by the hearing examiner, who called it "both well-reasoned and cogent."

Furthermore, the testimony of Ms. Gary's own expert witnesses showed that the average person would not have been injured by the work-related events in question. Dr. Saavedra testified:

> Q. Now let's assume that Ms. Gary never had the pre-existing psychiatric history that she had and she did not have any of these sexual harassments or any of the psychological crises that she had. Would an event that occurred on June 1, 1992, without consideration of the prior conditions, have precipitated this disability?
>
> A. If none of the issues existed, the result would have been the first occurrence of a conflict at work?
>
> Q. Yes.
>
> A. My answer is probably not.

Ms. Gary cites other portions of Dr. Saavedra's testimony in which he stated that the events of June 1992 "could precipitate a major" psychological injury in another person. However, that part of Dr. Saavedra's testimony related specifically to someone in Ms. Gary's particular state of mind; it did not meet the objective standard required by *Spartin*.

Ms. Gary also relies upon a portion of Dr. Ryan's testimony to support her claim that the events of June 1 would have caused a similar injury in the average worker. But in this instance also, Dr. Ryan's testimony related to a worker in Ms. Gary's subjective state of mind, not the objective person identified by the standard set forth in *Spartin*. In fact, Dr. Ryan testified:

> Q. Now doctor, can you render an opinion, within a reasonable medical certainty, that the events that Ms. Gary described to you as having occurred on June 1, 1992, would have caused a similar reaction in someone not otherwise so disposed?
>
> A. No. You know, I think that is the whole reason. It is her whole experience with this company over that whole period of time, going back to 1989, when they refused to give her leave right away for her daughter's graduation.

Relying on the testimony of these three expert witnesses, the hearing examiner determined that Ms. Gary had failed to offer any "evidence, testimonial or documentary, to support a finding that the conditions of her employment articulated, could have caused a similar injury in a person of ordinary sensibilities." We can find no reversible error in this ruling.

■ Ms. Gary argues that the examiner's decision was not based on substantial evidence because "[s]ufficient testimony was presented at [the] hearing to merit a finding that even someone not predisposed to psychological injury could have sustained an injury as a result of the events of June 1, 1992." But assuming that such evidence was presented, the relevant inquiry is whether the examiner's decision was supported by substantial evidence, not whether an alternative decision might also have been supported by substantial evidence. This court has frequently held that "[w]here there is substantial evidence to support the Director's findings ... then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Director." *McEvily, supra,* 500 A.2d at 1024 n. 3 (citations omitted); *accord, e.g., Upper Georgia Avenue Planning Committee v. Alcoholic Beverage Control Board,* 500 A.2d 987, 992 (D.C.1985) ("[w]e must uphold the Board's decision so long as it is supported by substantial evidence, even though there may also be substantial evidence to support a contrary decision").

■ In this case the hearing examiner specifically credited Dr. Schulman's testimony that a person not suffering from Ms.

Gary's pre-existing condition would not have sustained similar emotional injuries. Dr. Saavedra's testimony confirmed that conclusion, and it was not disputed by Dr. Ryan. The examiner also had before him substantial evidence of the non-work-related stressors which contributed to Ms. Gary's pre-existing condition. The testimony of the doctors, as well as the other record evidence, was sufficient to support his conclusion.

The facts of this case are remarkably similar to the facts presented in *McEvily*, in which we affirmed the denial of benefits to a WMATA employee who, like Ms. Gary, also complained of work-related emotional injuries. In that case, the hearing examiner also based his conclusion principally upon testimony from the very same Dr. Schulman, who appeared on behalf of the employer. The doctor testified that the particular injury suffered by the petitioner in *McEvily* would not have affected the average person. As in the instant case, evidence of non-work-related stressors on the petitioner was also introduced and considered by the hearing examiner in *McEvily*. In affirming the denial of benefits, this court stated:

> The testimony of Dr. Schulman, credited by the examiner, in conjunction with the additional evidence of record that revealed the poor health of petitioner's wife and his marital problems, provided a substantial basis from which to conclude that petitioner's depression did not arise out of his employment. Accordingly, we find substantial evidence to support the conclusion that petitioner did not suffer a compensable injury under the Act . . . .

*McEvily, supra,* 500 A.2d at 1023–1024. It follows from *McEvily* that the examiner's findings in this case were based on substantial evidence, and that his decision to deny benefits followed rationally from those findings.

The DOES compensation order is therefore

*Affirmed.*